IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CAROL CLARK-KUTSCHER, | |
| Plaintiff, | |
| v. | Case No. 3:21-CV-01446-NJR |
| SSM HEALTH CARE CORPORATION, | |
| Defendant. | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Overpopulated hospitals, a shortage of personal protective equipment, overworked nurses and hospital staff—this lawsuit originates in the height of the COVID-19 pandemic. At a time when most frontline medical workers were celebrated as heroes, Carol Clark-Kutscher found herself fired. Clark-Kutscher worked as a palliative care Nurse Practitioner at SSM Health Good Samaritan Hospital[1] ("Good Samaritan") starting in June 2019 until her termination in October 2020. (Docs. 36-1, pp. 19-20; 36-2). Palliative care involves educating and assisting patients with chronic disease management, life-limiting illnesses, and end-of-life decision-making including Power of Attorney and Do Not Resuscitate ("DNR") decisions. (Doc. 36-4). As a nurse practitioner, Clark-Kutscher performed comprehensive patient assessments, developed treatment

---

[1] SSM Health Care Corporation is named as the defendant in the Complaint. (Doc. 27). St. Mary's Good Samaritan, Inc. is a subsidiary of SSM Regional Health Services, which is, in turn, a subsidiary of SSM Health Care Corporation. (Doc. 39). For the purposes of this Order, the Court will refer to Defendant as "Good Samaritan."

plans, and supported patients in completing various health care directives, known as advanced directives or Practitioner Orders for Life-Sustaining Treatments ("POLST") forms, which describe the treatments patients consent to receive if necessary to sustain life. (*Id.*; Docs. 36-3, pp. 49-50, 58-60; 40-3, pp. 24-28). These types of end-of-life decisions and documentations commonly fall under the umbrella of "advanced care planning." (Docs. 36-4; 40-3, pp. 25-26). Clark-Kutscher completed documentation for her patient interactions and services, which would be reviewed by a collaborating physician, Dr. Trenton Grimm, who reported to Dr. Cory Black, Chief Medical Officer for Good Samaritan. (Docs. 36-3, p. 94; 40-3, p. 196).

During the first half of her employment with Good Samaritan, Clark-Kutscher worked under Jennifer Sims and received a formal performance evaluation from Sims in December 2019. (Docs. 36-1, p. 26; 40-6, pp. 42-47). In that evaluation, Sims rated Clark-Kutscher as "exceeds expectations" in most categories and "meets expectations" in others. (Doc. 40-5, p. 21; 40-6, pp. 42-47). Shortly after her positive performance review, Clark-Kutscher briefly reported to Dr. Black. (Doc. 36-3, pp. 18-19). Then in February 2020, Clark-Kutscher began directly reporting to Heather Turner and remained Turner's subordinate until her eventual departure from Good Samaritan. (*Id.* at pp. 37-38; Docs. 36-1, pp. 26-27; 36-2).

Fast-forwarding to late September 2020, Clark-Kutscher received a Notice of Corrective Action for several documented incidents throughout the preceding two months. (Doc. 37). The Notice explained that Turner received several reports that Clark-Kutscher exhibited non-compassionate and aggressive behavior towards patients,

sometimes pushing them to make hasty end-of-life decisions. (*Id*.). In one specific incident, Turner heard that Clark-Kutscher revealed a terminal diagnosis to a patient whose physician had not yet disclosed or discussed that information. (*Id*.). In another, a patient purportedly complained that Clark-Kutscher forced him to choose a DNR classification to be transferred to a nursing home. (*Id*.). Clark-Kutscher also allegedly attempted to get a young COVID-19 patient to refuse CPR. (*Id*.). The Notice also cited instances of incomplete documentation regarding appropriate contacts and chosen decision-makers for her patients. (*Id*.) Turner also admonished Clark-Kutscher for refusing referrals from physicians for comfort care orders for patients at discharge. (*Id*.) According to Turner, Clark-Kutscher's vernacular caused discomfort amongst her colleagues. (*Id*.). Clark-Kutscher used words like "roadkill" and "toast" to describe dire patient conditions. (*Id*.; Doc. 40-3, pp. 192-93).

Of course, Clark-Kutscher denied and provided explanations for the reported conduct. Responding to the incident where Clark-Kutscher revealed a terminal diagnosis, she contended the patient should have already known about his terminal condition as he left a prior hospital with that diagnosis. (Doc. 37). Clark-Kutscher also argued that she helped the patient by attempting to find his brother for power of attorney purposes. (*Id*.). In response to the patient complaint about a forced DNR status, Clark-Kutscher detailed her interactions with the patient and his long history of non-compliance, drug and alcohol abuse, and homelessness. (*Id*.). She denied ever forcing him to elect a code status before allowing him to transfer to a nursing home and stated that he had completed a POLST form and wanted to be DNR. (*Id*.). With the young COVID-19 patient, Clark-Kutscher

explained that she urged the patient and her husband to consider choosing no CPR because such measures proved ineffective with COVID-19 and could unnecessarily expose employees to the virus. (*Id.*). Regarding documentation, Clark-Kutscher described her specific methodology of using different note formats based on each visit. (*Id.*). As to the distasteful phrases, according to Clark-Kutscher, "roadkill" and "toast" were commonly used amongst nurses during her multi-decade career, not out of disrespect to patients but to efficiently convey the level of severity for each patient. (Doc. 40-3, pp. 192-93). For the comfort care refusals, Clark-Kutscher asserted that she could not place orders for narcotics without first seeing the patient. (Docs. 37; 40-12).

Two weeks after the initial Notice, Turner, with support from human resources, issued a Final Notice of Corrective Action that detailed other misconduct including incorrect or missing documentation, incomplete notes, inadequate records of patient assessments, and poor communication with a physician. (Doc. 37). That notice threatened further corrective action, including termination, if she failed to improve performance. (*Id.*). For each Notice of Corrective Action, Clark-Kutscher met with Turner and a human resources representative, Christy Carroll. (Docs. 36-3, pp. 117-19; 36-5, pp. 41-42).

Upon delivery of the Final Notice, Clark-Kutscher was given one week to modify her behavior or risk termination. (*Id.*; Doc. 37). Clark-Kutscher recalled that Carroll stuck a finger in her face and called her "the most despicable person she had ever met." (Docs. 40-3, p. 161; 47-1). Upset, Clark-Kutscher walked back to her office to pack up her belongings. (Docs. 36-3, pp. 118-19; 40-3, pp. 165-66). Based on the contentious nature of the meeting and the aggressive attempts to get Clark-Kutscher to quit, she construed the

Notice and accompanying conversation with Turner and Carroll as a termination and told coworkers that she had just been fired. (Docs. 36-1, pp. 165-67; 36-3, pp. 120-21). Turner and Carroll arrived at Clark-Kutscher's office as she packed up. (Docs. 36-3, p. 121; 36-5, pp. 48-49). Carroll claims that she emphasized that Clark-Kutscher had an opportunity for performance improvement, and the Notice was not a termination. (Doc. 36-5, pp. 48-49). Carroll also testified that, during this interaction, Clark-Kutscher voluntarily resigned with the promise of two weeks' pay. (*Id.* at p. 49). After ensuring that Clark-Kutscher left the building, Carroll filled out termination records in Workday, a digital human resources system. (Doc. 46-2, pp. 50, 55-56). In Workday, Carroll selected "Involuntary resignation at company's request" as the primary reason for termination. (*Id.* at p. 56; Doc. 40-9, p. 57).

According to Clark-Kutscher, the reported reasons for disciplinary action were a ruse to force her out of Good Samaritan. Clark-Kutscher believed that the corrective action notices and her ultimate termination stemmed from her refusal to adjust documentation so her services could be billed to Medicare or insurance. (Doc. 40-3, pp. 63-71, 161). During the disciplinary process, Clark-Kutscher expressed concern that management asked her to commit "Medicare fraud" by representing each of her services as billable or to falsely document her patient interactions as consults. (Docs. 40-3, pp. 63-64, 70, 161; 40-9, pp. 28-33).

For context, medical service providers at Good Samaritan completed consultation and progress notes to document the services rendered to patients. (Docs. 36-3, p. 83; 36-6, p. 42; 40-3, p. 71). The content of those notes helped a hospital coder apply the

appropriate code for the provided services, and eventually, the billing department generated a bill based on the codes. (Doc. 36-6, pp. 13-14). From the bill, Good Samaritan sought reimbursement from Medicare or insurance. (*Id.*). Clark-Kutscher referred to the practice of completing her service documentation and notes as "billing," as a short form way of describing the aforementioned process. (*See* Docs. 36-1; 40-3). While she did not code or formulate any bill, Clark-Kutscher allowed billing requirements to inform her note drafting and remained cognizant that codes were applied to her notes, which eventually translated into bills. (Doc. 36-1, pp. 38-41). To be clear, Clark-Kutscher held responsibility for correctly documenting the details of her patient interactions and services, not to apply codes or submit bills to insurance. (Doc. 36-5, p. 45). Debbie Wilkins, a Certified Coding Specialist at Good Samaritan, assigned codes to Clark-Kutscher's documentation. (Doc. 36-6, pp. 12-13, 15-16, 19).

Turner and Clark-Kutscher disagreed on many occasions over how to document certain services for proper coding and billing. (*See* Docs. 36-1; 36-3; 36-5; 37; 40-8; 40-10; 40-12). Providers, including Clark-Kutscher, filled out consultation notes for their first interaction with a patient and progress notes for any subsequent interactions with the same patient. (Doc. 36-6, p. 18). Within patient care notes, specific information must be included for codes to be applied. (*Id.* at pp. 28-34; Docs. 40-7, pp. 13-18; 40-8, p. 6). For example, medical visits billable to Medicare must include an in-person consultation with a provider where the patient can be physically assessed and examined. (Docs. 36-6, p. 36; 40-3, pp. 29-31). During the pandemic, however, Clark-Kutscher struggled to physically meet with COVID-19 patients because of their fragile condition and Good Samaritan's

limited supply of personal protective equipment ("PPE"). (Docs. 36-6, p. 36; 40-3, pp. 34-35, 68, 114). Instead, she spoke with many patients over the phone, which was not a billable service. (Doc. 40-3, pp. 107, 114). Clark-Kutscher also insisted that advance directives and completion of POLST forms were free services that made up the bulk of her work. (*Id.* at pp. 31-33). In May 2020, the palliative care unit participated in a telephonic meeting where Clark-Kutscher understood she was being instructed to document interactions with Medicare patients as consultations. (Doc. 36-1, pp. 62-63). Clark-Kutscher also testified that Turner instructed her to create billable notes for advanced directives and to document every patient interaction as a consult after this meeting. (*Id.* at pp. 55, 63-65, 69). Following up, Turner and Dr. Black sent Clark-Kutscher templates of notes to solve the documentation issues. (*Id.* at pp. 65-66; Doc. 40-3, pp. 67-68). Dr. Grimm and Turner reprimanded her for documentation issues. (Doc. 36-1, pp. 55-56).

In late August 2020, Wilkins emailed Clark-Kutscher to address some concerns regarding her documentation. (Doc. 40-8, p. 7). Wilkins wrote,

> "I have noticed that on your Consultation H&P's I am not getting enough information to give a charge for the note. There have been a lot of no charges for these consultation notes. I am looking at one now and it just is a couple of sentences. Many of the notes refer to discussion with family about patient code status, POLST forms, etc. To give a Consultation H&P charge, I would need to have all of the elements required for an H&P. Also, there are progress notes that are similar in nature and I would need the elements required for subsequent notes in order to charge these."[2]

---

[2] "H&P" means history and physical exam. (Doc. 36-6, p. 41).

(*Id.*). Clark-Kutscher forwarded the email to Turner, who spoke with Wilkins in further detail. (*Id.* at pp. 6-7). Turner then provided information to Clark-Kutscher about the necessary elements for progress notes to resolve the deficiencies identified by Wilkins. (*Id.*). In response, Clark-Kutscher emphasized that she knew the requirements for consult and progress notes and explained that in the questioned documentation she merely spoke with the families regarding code status and, thus, her notes were sufficient for this non-billable service. (*Id.* at p. 5). Wilkins eventually agreed. (*Id.* at p. 2). Turner further highlighted to Clark-Kutscher that she could create a consult note if she completed a full assessment, and she could enter progress notes if two of the three required components were present per the coding manual. (*Id.* at p. 5).

A month after that email exchange, Turner reached out to Wilkins to see if in-person advanced directives were a billable service or if a full assessment would be necessary. (Doc. 40-10, p. 3). Wilkins informed Turner that a full assessment was necessary to charge, whereas simply discussing an advanced directive without any patient examination could not be charged. (*Id.*). Clark-Kutscher interjected to express that she considered advance directives and POLST forms as "no charge" services even though they were listed as consults in the system. (*Id.* at p. 2). Turner replied clarifying that if Clark-Kutscher saw a patient, she should conduct an assessment and enter a consult note that complied with the billing requirements. (*Id.*). Turner further instructed Clark-Kutscher to create progress notes in a billable format when following-up with a patient. (*Id.*).

Aside from billing practices, Clark-Kutscher also alleges that Good Samaritan terminated her because of her age and replaced her by a much younger candidate.

(Doc. 27). During her deposition, however, Clark-Kutscher did not mention age as a suspected reason for her termination. (Doc. 36-1, pp. 10-11). She was 61 years old when she departed from Good Samaritan. (*Id.* at p. 10; Doc. 36-2). About three months later, Good Samaritan filled her vacant role with Jennifer Starr, a 40 year-old newly graduated Nurse Practitioner. (Doc. 38). Clark-Kutscher subsequently filed a charge alleging age discrimination with the Illinois Department of Human Rights ("IDHR"), which dismissed the charge for lack of substantial evidence after an investigation. (Docs. 36-7; 36-8).

Clark-Kutscher sued Good Samaritan in November 2021, and amended her Complaint in May 2022. (Docs. 1; 27). Her four-count Amended Complaint contains allegations of retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), *et seq.,* and the Illinois Whistleblower Act, 740 ILCS 174/20, along with age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Illinois Human Rights Act, 775 ILCS 5/1-101.1. (Doc. 27). Now, Good Samaritan moves for summary judgment arguing that Clark-Kutscher has failed to produce evidence supporting her retaliation and age discrimination claims that create a genuine issue of material fact. (Docs. 35-39). Clark-Kutscher filed a timely response in opposition to the motion, to which Good Samaritan filed a timely reply. (Docs. 40; 46).

## LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

DISCUSSION

I.      **Retaliation**

        a.   *False Claims Act (FCA)*

The FCA prohibits and imposes civil penalties for known submissions of false or fraudulent claims for payment or approval to the government. 31 U.S.C. §§ 3729-3733. Employees are protected from retaliation, including discharge, demotion, and other forms of harassment or discrimination, for any lawful act taken in furtherance of an action under the FCA or for other efforts to stop one or more violations of the FCA. *Id.* at § 3730(h). To prevail on a retaliation claim, a plaintiff must demonstrate that (1) he or she acted in furtherance of an FCA enforcement action or to stop at least one violation of the FCA; (2) the employer had knowledge of plaintiff's engagement in this protected conduct; and (3) the discharge was motivated, at least in part, by the protected conduct. *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002);

*Halasa v. ITT Educational Services, Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012). To determine whether an employee's conduct is protected under the FCA, both a subjective and an objective inquiry are necessary. Courts evaluate whether (1) the employee, in good faith, believed that the employer was committing fraud against the government, and (2) a reasonable employee in the same or similar circumstances could hold the same belief. *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016). For the objective prong, courts consider facts known to the employee at the time of the alleged protected activity. *Id.*

### i. *Protected Activity*

In its motion for summary judgment, Good Samaritan identifies Clark-Kutscher's only possible protected activity as refusing to "bill" advance directives as consultation notes or progress notes and declining to perform consultations on patients who she could not see face-to-face. Clark-Kutscher's refusal to perform these tasks, according to Good Samaritan, represents an absurd basis for protected activity. Good Samaritan argues that Clark-Kutscher held one responsibility: accurately documenting her patient interactions. She did not submit bills to Medicare or select codes for her provided services. Moreover, simply drafting a consultation note or progress note would not provide a basis for Good Samaritan to bill Medicare, rather the note's content guided the coding and billing decisions. Good Samaritan contends that, at most, Clark-Kutscher refused to heed clerical directions about how to document patient interactions, not any instructions to falsify her notes or commit fraud.

On the contrary, Clark-Kutscher argues that expressing her concerns to her

supervisor, Turner, about potential Medicare fraud constituted protected activity. Clark-Kutscher believed management asked her to formulate her notes to transform non-billable services to billable services. Those non-billable services included patient interactions over the phone and visits without a physical assessment, including the execution of advanced directives and POLST forms. Clark-Kutscher worried about committing fraud and losing her license if she followed her supervisor's instructions.

As an initial matter, when an employee reports instances of potential FCA violations to a supervisor, a trier of fact could find that the employee engaged in "efforts to stop" an FCA violation. *United States ex rel. Sibley v. Univ. of Chicago Medical Center*, 44 F.4th 646, 663-64 (7th Cir. 2022). Here, Clark-Kutscher's testimony makes clear that she repeatedly told Turner, her supervisor, that billing or drafting her notes as directed would be "illegal" and constitute "Medicare fraud." While reporting to a supervisor can constitute protected activity, the Court must still determine whether the employee had a good-faith belief that the employer acted fraudulently towards the government, and whether a reasonable employee in similar circumstances could hold the same belief considering the facts known at the time. *Id.* at 661. Within this analysis, Clark-Kutscher's claim under the FCA is doomed.

Taking all the evidence in the light most favorable to Clark-Kutscher, the record demonstrates that she believed, in good-faith, that Good Samaritan asked her to commit fraud against the government. Her belief, however, was not reasonable given the facts in evidence. Thus, a reasonable employee in similar circumstances would not believe Good Samaritan committed fraud against the government or asked Clark-Kutscher to do so.

Clark-Kutscher points to her testimony, declaration, and emails exchanged between her, Turner, and Wilkins as presenting genuine issues of material fact that Turner and other employees repeatedly asked her to "bill" for services that, under the standards for Medicare, were non-billable, such as advanced directives and POLST forms. She also leans on her decades-long career and training related to Medicare billing practices to demonstrate the reasonableness of her belief that Good Samaritan attempted to defraud the government. But the evidence falls short of creating a triable issue.

Through her testimony, Clark-Kutscher explained that nurse practitioners in advanced care planning assess patients as a provider, develop care plans, and write orders or prescriptions. She testified that, personally, she would "plan" on every patient she saw. Clark-Kutscher described that as a nurse practitioner her consultation notes and progress notes were billable to Medicare. She acknowledged, however, that these patient care notes, to be billable, must meet certain criteria and include specific information. Admittedly, Clark-Kutscher did not know what billing codes were actually applied to her notes or what services were billed to Medicare.

Clark-Kutscher points to a few examples in the record to show that Good Samaritan urged her to bill for services that should have been free. First, she testified that, in the May palliative care phone meeting, another nurse told her to document all interactions with patients as consultations. Next, Clark-Kutscher testified that Turner instructed her, via phone and email communications, to complete billable notes (such as progress notes) on advanced directives and POLST forms. Lastly, she testified that she was asked to do consults on patients who could not talk or that she could not physically

visit and assess. The COVID-19 pandemic also hindered her ability to meet with patients in-person and fundamentally shifted her work due to the alarming rate of infection and death from the virus. Because of the pandemic, her ability to offer billable services plummeted, which created tension with Turner, who aimed to maximize billable services.

This evidence, at most, shows that Turner preferred each patient interaction to be captured in a consultation note or progress note. While these notes can be billable, if the content of the notes did not meet the billing criteria, Wilkins coded the notes as "no charge." There is no evidence that Turner pushed Clark-Kutscher to record false information within her patient care notes so that unperformed services could be submitted to Medicare or insurance for reimbursement. In fact, Clark-Kutscher testified that no one at Good Samaritan told her to include a service in her notes that she did not provide, only that she was instructed to put her notes in a "billable format," meaning in a consultation or progress note. Further, Clark-Kutscher admitted that, in the past, she included advanced directives in consultation or progress notes, not for billing purposes, but to follow-up on what was previously done with a patient.

The email communications between Turner, Wilkins, and Clark-Kutscher are no more helpful in creating a triable issue. Wilkins emailed Clark-Kutscher regarding possibly deficient information in her patient care notes, which Turner sought to rectify by outlining the necessary information for progress notes to be billable. Turner directly messaged Wilkins, who explained that when Clark-Kutscher simply called a patient's family regarding a code status her notes sufficiently recorded the "no charge" service. Turner then asked if it was appropriate to enter progress notes for "no charge" services.

Addressing the issue about consultations, Turner told Clark-Kutscher that full consults are only necessary if Clark-Kutscher completed a full assessment on a patient. In another email chain, Turner instructed Clark-Kutscher to complete an assessment and enter an assessment note if she was seeing a patient. In similar advice, Turner directed Clark-Kutscher that "if [she] follow[ed]-up with the patient" her follow-up notes needed to be "in the format that is billable." Clark-Kutscher now hangs her hat on that statement as evidence that Turner urged her to commit fraud. But Turner's statement does not warrant such an inference, instead the instruction is benign—for patient follow-ups, the follow-up notes should be recorded in a billable format. Much of the tension between Turner and Clark-Kutscher related to note formatting and inclusion of sufficient detail for the coder to properly assess and code the note. The record also shows an ongoing effort by Turner and Dr. Black to create workable templates with Clark-Kutscher, to ensure notes captured the appropriate and necessary information.

There may be a reasonable inference from the deposition testimony and emails that Turner pressed Clark-Kutscher to perform more billable services like patient assessments, instead of solely conducting non-billable visits with advanced directives and POLST forms. But this does not constitute Medicare fraud. If Clark-Kutscher assessed a patient while also completing an advanced directive or POLST form, the consultation or progress note could properly be billed for some of those rendered services. Thus, even if a trier of fact inferred that Turner pushed Clark-Kutscher to increase her billable services through more assessments, refusing to do so would not qualify as protected conduct under the FCA. The COVID-19 pandemic undoubtedly reduced Clark-

Kutscher's ability to visit with patients in-person and created danger in doing so, especially with PPE shortages. If Turner expected Clark-Kutscher to assess more patients within these conditions, though harsh and perhaps foolish, such an expectation would not constitute Medicare fraud.

Again, even taking all evidence in Clark-Kutscher's favor, she cannot find protection under the FCA for retaliation based on her conduct. The record shows, at most, she refused to document patient interactions through consultation and progress notes. Such refusal cannot constitute an effort to stop an FCA violation, because if she documented her patient interactions accurately within either a consultation or progress note, the content of each note would be assessed independently to determine if billing codes applied. In fact, when she did document non-billable services in such formats, she explicitly indicated that she did not meet with the patient face-to-face or that she only discussed certain topics over the phone, and Wilkins applied a "no charge" code for those notes. Clark-Kutscher's belief, given the facts known to her at the time, that Good Samaritan committed fraud against the government or asked her to do so was not reasonable. Thus, she fails the objective prong necessary to demonstrate that she engaged in protected conduct under the FCA.

Accordingly, the Court finds that Clark-Kutscher's FCA retaliation claim fails as a matter of law.

**b.** *Illinois Whistleblower Act*

The Illinois Whistleblower Act prohibits an employer from retaliating against an employee for "refusing to participate in an activity that would result in a violation of a

State or federal law, rule, or regulation[.]" 740 ILCS 174/20. Thus, for a cause of action under the Whistleblower Act, a plaintiff must establish that "(1) he refused to participate in an activity that would result in a violation of state or federal law, rule, or regulation and (2) his employer retaliated against him because of that refusal." *Sardiga v. Northern Trust Co.*, 948 N.E.2d 652, 656-57 (Ill. App. Ct. 2011).

Here, as with the analysis under the FCA, Clark-Kutscher fails to establish that the activity she refused–documenting advanced directives, POLST forms, or any other service within a consultation note or a progress note–would result in a violation of State of federal law, rule, or regulation. Again, nothing in the record suggests that Turner or anyone else nudged Clark-Kutscher to misrepresent the content of her patient interactions within her documentation. Moreover, when Clark-Kutscher drafted patient care notes that indicated she only spoke on the phone with a patient or family member and that she did not assess a patient face-to-face, the emails in evidence show that no violation of State or federal law occurred. Instead, her assigned coder, Wilkins, coded the interaction as "no charge" in accordance with Medicare standards and federal law.

For these reasons, Clark-Kutscher's claims under the Illinois Whistleblower Act also fail as a matter of law.

## II.   Age Discrimination

### a.   *Age Discrimination in Employment Act (ADEA)*

Under the ADEA, workers 40 years of age and older are protected against age-based employment discrimination. *Wrolstad v. Cuna Mutual Ins. Society,* 911 F.3d 450, 454 (7th Cir. 2018). The ADEA prohibits employers from discharging "any individual or

otherwise discriminat[ing] against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To substantiate a claim under the ADEA, a plaintiff must identify facts in evidence that his or her age was the "but-for" cause of the termination, not only that age was a motivating factor. *Wrolstad*, 911 F.3d at 454. In other words, an employee-plaintiff must demonstrate that, but for his or her age, the termination would not have occurred. *Id.*

At the summary judgment stage, the principal question is whether the evidence, as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Wrolstad*, 911 F.3d at 454. Direct and circumstantial evidence are both relevant to this inquiry. *Id.* Under the traditional *McDonnell Douglas* approach, once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 957, 960 (7th Cir. 2021); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). If the employer does so, the burden shifts back to the plaintiff to show that the proffered reason was a pretext for age discrimination. *Id.*

Altogether, a plaintiff seeking to establish a prima facie case of age discrimination must show: (1) she was a member of a protected class (age 40 or over), (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action,

and (4) the employer treated younger, similarly-situated employees more favorably, or sought to replace her with someone substantially younger. *Harris v. Franklin-Williamson Human Services, Inc.*, 97 F. Supp. 2d 892, 904-05 (S.D. Ill. 2000); *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999) ("In situations involving the simple termination of a single employee, normally the employee must establish that the employer *sought a younger replacement* for him."). To be clear, the younger replacement need not be someone outside the protected class. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). The ADEA prohibits discrimination on the basis of age, not class membership. *Id.* A substantially younger replacement is a far more reliable indicator of age discrimination than a replacement outside of the protected class. *Id.* Under *O'Connor*, a ten-year age difference is presumptively "substantial." *Harris*, 97 F. Supp. 2d at 905.

Here, both parties agree that Clark-Kutscher is a member of a protected class, satisfying the first element. Good Samaritan argues, however, that Clark-Kutscher cannot substantiate the second, third, or fourth prongs of a prima facie case. Good Samaritan asserts that Clark-Kutscher failed to meet its legitimate expectations at the time of her termination because Turner received several complaints involving Clark-Kutscher's inadequate patient care along with Clark-Kutscher's deficient documentation of patient interactions. From Good Samaritan's perspective, Clark-Kutscher resigned, and thus, cannot demonstrate she suffered an adverse employment action. As to the fourth prong, Good Samaritan emphasizes that it did not "replace" Clark-Kutscher with a substantially younger employee, because it filled her former role months later with a recent nurse practitioner graduate who had more palliative care experience than Clark-Kutscher and

also qualified as a member of the protected class.

On the other hand, Clark-Kutscher argues that she satisfies all elements of a prima facie case of age discrimination. For the second prong, Clark-Kutscher maintains that she met the legitimate expectations of Good Samaritan despite the significant hurdles and unique challenges of the pandemic, and Good Samaritan's expectations regarding billing were not legitimate. She also contends that Good Samaritan fired her, as reflected in the nature of the heated corrective action meetings, internal human resource documents that describe her termination as an involuntary resignation at the company's request, and her refusal to resign. As Good Samaritan replaced her with Jennifer Starr, a substantially younger employee, Clark-Kutscher argues that the fourth prong is satisfied. Further, Clark-Kutscher claims that, even if Good Samaritan articulates a legitimate, nondiscriminatory reason for firing her, it is pretextual considering her prior glowing performance review, the timing of her discipline, and the rushed nature of the corrective action process.

Turning first to the third and fourth prongs of a prima facie case, the deposition testimony of Clark-Kutscher and Carroll establish that the final corrective action meeting occurred swiftly after the initiation of the disciplinary process, the meeting grew contentious in nature, the human resources documents labeled the termination as involuntary resignation, and Clark-Kutscher received two weeks' pay and unemployment after departing from Good Samaritan. The record also supports Good Samaritan's position that Clark-Kutscher resigned and that the Final Notice of Corrective Action provided a window for improvement and indicated that the next step might be

termination. This is enough to create a genuine issue of material fact related to whether she suffered termination or resigned. As to whether Good Samaritan replaced Clark-Kutscher with a substantially younger employee, a genuine issue of material fact also exists. Starr, a nurse practitioner about 20 years younger than Clark-Kutscher, eventually filled Clark-Kutscher's vacant role. Even though Good Samaritan waited months to hire a replacement, a reasonable jury could find that Clark-Kutscher was "replaced" by a substantially younger employee.

For the prong concerning the employer's legitimate job expectations, the prima facie case and pretext inquiries often overlap. As such, a court may "skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Benuzzi v. Board of Education of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011). Here, Good Samaritan, while maintaining Clark-Kutscher resigned, offers nondiscriminatory explanations for the corrective actions issued to Clark-Kutscher near the time of her departure. Turner received and documented several reports that Clark-Kutscher exhibited non-compassionate and aggressive behavior towards patients, including pressuring them to make rash end-of-life decisions dating back to July. Clark-Kutscher also reportedly refused referrals from physicians for comfort care orders for patients at discharge, used inappropriate vernacular to describe patient conditions, and failed to document critical information for use by other hospital staff and her coder.

Clark-Kutscher argues that these nondiscriminatory reasons are pretextual. First, Clark-Kutscher highlights her prior annual performance review with positive ratings for

exceeding and meeting expectations to demonstrate pretext. Next, she characterizes the timing of the notices of corrective action as suspicious considering she began complaining about billing practices in early-September 2020, when the corrective action process started. Lastly, to show pretext, Clark-Kutscher points out that Good Samaritan accelerated its disciplinary process as her corrective action notices started at the second level, she only received a short time to improve her performance, and her termination occurred within three weeks of her first Notice of Corrective Action.

To substantiate pretext, a plaintiff must show that (a) the proffered nondiscriminatory rationale for termination was dishonest; and (b) the employer's true reason was rooted in prohibited discriminatory intent. *Mirocha v. Palos Community Hospital,* 240 F. Supp. 3d 822, 842 (N.D. Ill. 2017). The chief question is whether the employer honestly believed the reason it offered to explain the discharge, not whether the employer's stated reason was inaccurate or unfair. *Id.* A court's concern is not that an employer has been wrong about the employee's performance or too hard on the employee, rather to be pretextual, the nondiscriminatory reason must be a lie. *Id.*; *Coleman v. Donahoe,* 667 F.3d 835, 852 (7th Cir. 2012). Pretext can be demonstrated by identifying weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reason so that a reasonable person could find the reason unworthy of credence. *Coleman*, 667 F.3d at 852-53.

Here, Good Samaritan offered several reasons related to Clark-Kutscher's job performance for initiating disciplinary action. Job performance is a legitimate, nondiscriminatory reason for termination. As such, the burden shifts back to Clark-

Kutscher to demonstrate pretext. The evidence of pretext identified by Clark-Kutscher is unpersuasive. She responded to the Notice of Corrective Action, which outlined every reported incident, without denying that most of the incidents happened, but disagreeing with her supervisor's characterization of her behavior towards patients and other hospital staff. Further, Clark-Kutscher's prior positive annual performance review by a different manager does not create an inference of pretext. The positive review addressed her performance in the first several months of her employment, took place pre-pandemic, which changed the nature of her work and stretched her extraordinarily thin as acknowledged by Clark-Kutscher, and occurred almost ten months before her termination. Next, she characterizes the timing of the disciplinary process as suspicious considering she began complaining about the billing practices in early-September 2020. The record indicates, however, that Clark-Kutscher received verbal warnings prior to the written notices. The corrective actions incorporated incidents from as early as July 2020, and Clark-Kutscher challenged billing practices as early as May 2020, after a phone meeting with the palliative care team. Lastly, Clark-Kutscher stresses that Good Samaritan accelerated its disciplinary process. Certainly, veering from standard procedure could show pretext. But the record indicates that Clark-Kutscher received verbal counseling about her performance prior to the notices of corrective action, which demonstrates the process was not as accelerated as she claims. The timeline of the corrective action process compared to Good Samaritan's standard procedure, without more, would not lead a reasonable trier of fact to determine that Good Samaritan's reasons for disciplinary action were pretextual. In general, Clark-Kutscher's arguments

for pretext fail.

Most importantly, and dispositive for this issue, Clark-Kutscher must demonstrate the true reason for termination was rooted in prohibited discriminatory intent. Clark-Kutscher has not referenced any evidence that her age was the reason for her termination. Her pretextual arguments relate to her complaints of fraudulent billing practices, not age discrimination. In her deposition, Clark-Kutscher cited her refusal to participate in fraudulent Medicare billing practices as the reason her employment with Good Samaritan ended. She failed to mention age discrimination, even when questioned further. Clark-Kutscher does not offer much, if any, evidence or argument specific to age discrimination.

Considering the evidence at summary judgment, no reasonable factfinder could conclude that Clark-Kutscher's age caused her termination. Thus, age cannot be considered the "but for" cause, let alone any factor, in Clark-Kutscher's termination.

The Court finds that Clark-Kutscher's age discrimination claim under the ADEA fails as a matter of law.

### b. *Illinois Human Rights Act (IHRA)*

Age discrimination allegations under the IHRA are subject to the same analysis and burden of proof as a suit under the ADEA. *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659 (7th Cir. 2013); *see Zaderaka v. Illinois Human Rights Commission*, 545 N.E.2d 684, 687 (Ill. 1989). The analysis provided for the ADEA claim above is applicable to Clark-Kutscher's claim under the IHRA. As such, her IHRA claims fail for the same reasons.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by Defendant Good Samaritan (Doc. 35) is **GRANTED.** This entire case is **DISMISSED with prejudice**. The Court **DIRECTS** the Clerk's Office to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   September 8, 2023**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**